**STATE of North Dakota, Plaintiff/Appellee,**

v.

**John STEELE, Defendant/Appellant.**

**Cr. No. 436.**

Supreme Court of North Dakota.

Oct. 24, 1973.

Bayard Lewis, Wahpeton, for defendant/appellant.

Robert L. Eckert, State's Atty., Wahpeton, for plaintiff/appellee.

ERICKSTAD, Chief Justice.

On November 30, 1972, a Richland County jury found John Steele guilty of the crime of negligent homicide.

The charge arose out of a collision which occurred on Labor Day, September 4, 1972, five miles south of Wyndmere,

North Dakota, on State Highway 18, which took the lives of three persons.

The information alleges:

"That on or about the 4th day of September, 1972, within the County of Richland, State of North Dakota, the above named defendant did commit the crime of negligent homicide committed as follows, to-wit:

"That at said time and place the said defendant did drive an automobile on North Dakota Highway #18 approximately five miles south of the city of Wyndmere, North Dakota, in reckless disregard of the safety of others, such driving having been then and there the proximate cause of injury and death to Betty Jean Neu, Mark Alan Susag, and Florence Facey, and that the deaths of said persons ensued within one year of the injuries so received; that at the time of the said incident the defendant:

"(1) was driving his automobile while under the influence of intoxicating liquors;

"(2) was driving his vehicle on the left side of the center of the roadway in an attempt to pass another vehicle proceeding in the same direction at a time when the said left side of the roadway was not free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of a vehicle approaching from the opposite direction or the vehicle overtaken;

"(3) attempted to pass a vehicle approaching from the opposite direction to the left of said vehicle, instead of to the right as required by law; and

"(4) was driving his vehicle at an unsafe speed;

"contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of North Dakota."

At the close of the State's case, Mr. Steele moved that the court advise the jury to acquit. The motion was denied and Mr. Steele then presented his evidence. At the close of all the evidence Mr. Steele renewed his motion for an advised verdict of acquittal. This motion was denied. A verdict of guilty was returned on November 30, 1972, and on December 6, 1972, the date set for sentencing, Mr. Steele made a motion for arrest of judgment, which was denied. The court then sentenced Mr. Steele to the State Penitentiary for a period of not less than one nor more than five years, assessed a fine in the sum of $500 and revoked his driver's license for a period of five years. Mr. Steele appeals to this court from that judgment and sentence.

The facts of the case, as shown by the evidence, are as follows.

On September 4, 1972, John Steele was in Mooreton, North Dakota, participating in the yearly Labor Day activities. Harlan C. Muehler, a deputy sheriff of Richland County, who was acting as an umpire for the softball games being played in Mooreton, had known John Steele for five or six years. On three or four occasions during the day he observed John Steele around the softball grounds with a can of beer in his hand. Mr. Muehler observed that John was loud, had a red face and glassy eyes, and in his opinion John was under the influence of intoxicating liquor.

Lyle Marchus, a highway patrolman, was assigned to work the Mooreton area because of the Labor Day celebration. Late in the afternoon he saw Mr. Steele walking in a staggering manner from a local bar to his (Steele's) car, and, being of the opinion that Mr. Steele was under the influence, he cautioned him not to drive his vehicle. He said that Mr. Steele's eyes were "glassy—and sort of bloodshot" and that he could detect a strong odor of alcoholic beverage about him. In his opinion, Mr. Steele was under the influence of alcoholic beverage. John Steele's vehicle

was a two-door hardtop blue-gray Dodge Monaco.

Officer Marchus was accompanied at this time by Neal Skovholt, a farmer from Mooreton, who was a policeman in Mooreton for the Labor Day celebration. From the unsteady way Mr. Steele walked and his rough appearance, Mr. Skovholt formed the opinion that Mr. Steele was intoxicated.

At about 7 p. m. that evening Mr. Steele asked John Warner of Milnor, North Dakota, to drive his car for him. Leaving Mooreton, Mr. Warner drove the Steele vehicle to Wyndmere, North Dakota, where he parked it near the Siesta Lounge on the south side of Wyndmere and entered the lounge with Sig Bakke of Forman, North Dakota. Mr. Steele was left in the car and neither Mr. Warner nor Mr. Bakke saw him again that night.

Around 7:30 p. m. Keith Facey, in a 1969 green and white Plymouth, drove through the west side of Wyndmere heading south on State Highway 18. He was accompanied by his wife, Florence. As they left Wyndmere, he saw John Steele's vehicle near the highway and facing east. He recognized the Steele vehicle because John Steele was an acquaintance of his sons. Mr. Facey proceeded south on Highway 18 at a speed of 60–65 mph.

At about 7:45 p. m., when Mr. Facey's vehicle was about five miles south of Wyndmere, he noticed a car approaching from the south. It was traveling at a proper speed and on the proper side of the road. When that car was about five to ten feet from him, he realized that it was now coming toward him broadside. A collision resulted between his vehicle and the approaching vehicle. It later developed that this was a green Dodge sedan owned by Mark Alan Susag.

When Mr. Facey's vehicle came to rest it was in the ditch on the west side of the highway facing in a southwesterly direction with the Susag vehicle wrapped around its front end and facing in an easterly direction. He saw another vehicle quite some distance south of his vehicle in the ditch and field west of the highway.

After removing his injured wife from the car, he investigated and found that the two occupants of the Susag vehicle were dead. They were later identified as Mark Alan Susag, the driver, and Betty Jean Neu, his passenger.

The first person on the scene of the accident was William Anderson, a farmer from Colfax, North Dakota, who had been traveling south on Highway 18. When he was about three miles south of Wyndmere he noticed a big cloud of dust in the distance and upon investigation discovered the accident. He left immediately to get an ambulance and patrolman.

The next person on the scene was Donald Christianson, who arrived shortly after meeting Mr. Anderson on the highway. He was at the scene when the ambulance came to pick up Mr. and Mrs. Facey and also when Roger Erickson arrived.

When Roger Erickson reached the scene of the accident, he first checked on the occupants of the Susag vehicle. After finding that they were dead, he noticed another vehicle several hundred yards south of the Susag and Facey vehicles. Arriving at that vehicle he found a man lying face down on the ground on the driver's side with the driver's door open. The man was lying parallel to the car with his head facing the rear end of the car. Upon satisfying himself that the man was alive he placed a jacket over him and returned to the road.

Upon returning to the road, Mr. Erickson looked back and noticed that the man who had been lying by the car was moving around. He returned to the car and recognized the man as a fellow worker at Melroe Manufacturing in Gwinner, North Dakota—John Steele. Mr. Steele asked him to throw away the booze in his car but Mr. Erickson could see none. Mr. Erickson

observed that Mr. Steele was talking very incoherently, that his eyes were glassy and bloodshot, and that a strong odor of alcohol emanated from him. In his opinion Mr. Steele was under the influence.

Mr. Erickson and Mr. Christianson later helped Mr. Steele into an ambulance which took him to St. Francis Hospital in Breckenridge, Minnesota, the same hospital to which Mr. and Mrs. Facey had been taken earlier.

Officer Marchus arrived at the scene of the accident about 8:20 p. m. He saw two vehicles sitting on the right (west) shoulder of the highway in a broadside manner, one vehicle having been driven into the side of the other. There were two bodies in one vehicle. He also observed another vehicle some distance from where the first two vehicles were resting. He went to that vehicle and recognized it as the Steele vehicle which he had seen in Mooreton earlier that evening. In the vehicle he found a portion of a 12-pack of beer, with some cans empty, and a couple full.

Officer Marchus found skid marks in the southbound lane ending at a point where there were deep gouge marks in the road. He called this location "point zero". From point zero the rear end of the Facey vehicle was 56 feet south and 9 feet west of the west edge of the road. The Steele vehicle was 537 feet south of point zero and 19 paces west of the west edge of the road facing in a southwesterly direction. There was a second deep gouge mark in the northbound (east) lane of traffic 13 feet south of point zero and 3 feet east of the center of the road. The road was 26 feet wide. · Officer Marchus also noticed some scuff marks in the northbound lane which started approximately 7 feet south of point zero and proceeded south, crossing the centerline of the road and entering the west ditch. On entering the ditch he found tracks from the end of the scuff marks to where the Steele vehicle came to rest.

Richard Arenstein, a North Dakota highway patrolman from Wahpeton, arrived at the scene of the accident at approximately 9:15 p. m., and after talking to Officer Marchus he went to St. Francis Hospital. While at the hospital he was in the presence of Mr. Steele for about twenty minutes and during that time he observed that Mr. Steele was using loud, foul language and that his breath had a moderate odor of alcohol. In his opinion John Steele was under the influence. Officer Arenstein left the hospital at approximately 10:35 p. m.

While at the hospital, John Steele was examined by Dr. C. W. Jacobson of Breckenridge, Minnesota, a physician licensed to practice medicine in Minnesota and North Dakota. Dr. Jacobson saw nothing to lead him to believe that John Steele was intoxicated.

Dr. Jacobson examined and cared for Mrs. Facey until she passed away at 10:35 that evening. In his opinion she died as a result of the injuries she sustained in the auto accident.

On September 5, 1972, Officer Marchus talked to · Mr. Steele at his home. Mr. Steele told Officer Marchus that: he had been traveling about 65 miles per hour; he had gone to Lidgerwood after leaving Mooreton on September 4, 1972; his car had hit no other vehicle; and his car had been damaged when it hit the ditch.

At the trial, Officer Marchus testified that he had examined the Susag vehicle and found severe damage to the right front corner. Upon closer examination he found small areas of light blue-gray paint detectable on the green paint of the Susag vehicle. The Facey vehicle was green and white in color and the Steele vehicle was blue-gray. Samples of that part of the vehicle with the different colored paint were cut out and sent to the Federal Bureau of Investigation in Washington, D. C., for analysis. Officer Marchus also examined the right front corner of the Steele vehicle

and noticed similar but lesser damage with green paint on the blue-gray Steele vehicle. Similar samples of this material were cut and sent to the F.B.I.

Jerry Butler, a special agent for the F.B.I., assigned to the instrumental analysis unit of the F.B.I. laboratory, testified that he had analyzed the samples sent in by Officer Marchus and that in his opinion the light blue-gray metallic smears on the metal from the Susag vehicle could have originated with the Steele vehicle.

Mr. Steele asserts nineteen specifications of errors of law and six specifications of insufficiency of the evidence. We shall consider the specifications in the order in which he has argued them in his brief.

In Specification of Error No. X he asserts that the court erred in instructing the jury on the crime of negligent homicide. The part complained of reads:

"The crime of Negligent Homicide may be committed by the driving of a motor vehicle under various circumstances. In this case the State has charged in the Information that the crime of Negligent Homicide was committed in *one or more* of four situations; that is, that at the time of the said incident the defendant: (1) was driving his automobile while under the influence of intoxicating liquors; (2) was driving his vehicle on the left side of the center of the roadway in an attempt to pass another vehicle proceeding in the same direction at a time when the said left side of the roadway was not free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of a vehicle approaching from the opposite direction or the vehicle overtaken; (3) attempted to pass a vehicle approaching from the opposite direction to the left of said vehicle, instead of to the right as required by law; and (4) was driving his vehicle at an unsafe speed.

"The burden of proof resting upon the State is satisfied only if the evidence shows, beyond a reasonable doubt, the following essential elements of the offense charged:

"(1) That on or about the 4th day of September 1972, in Richland County, North Dakota, the Defendant, John Steele, drove a motor vehicle under *one or more* of the foregoing circumstances; and

"(2) That he did so in willful or reckless disregard of the safety of others; and

"(3) That the deaths of Betty Jean Neu, Mark Alan Susag, and Florence Facey, human beings, ensued within one year as a proximate result of injury received by reason of such driving; and

"(4) That such homicide was not committed under circumstances constituting 'excusable homicide.'"

Mr. Steele argues that this part of the instruction completely misquoted the information when it asserted that the information charged that the crime was committed in one or more of four circumstances. He asserts that the information charged that Mr. Steele drove his vehicle in reckless disregard of the safety of others and that at the time of the incident he was doing the other items individually listed, which other items constituted separate offenses. He concludes that the instruction was therefore confusing and misleading to the jury in light of the evidence and other instructions.

In response, the State asserts that the four circumstances were included in the information so that the information would not only inform Mr. Steele of the crime with which he was charged, but also state the particulars of the offense so as to avoid the necessity of a bill of particulars. In other words, the information set forth four separate offenses, the commission of

any one of which could have constituted driving a vehicle in reckless disregard of the safety of others.

In the instruction the court first quoted the criminal information verbatim. Later it defined the crime of negligent homicide.

"When the death of any person ensues within one year as a proximate result of injury received by the driving of any vehicle in reckless disregard of the safety of others, the person so operating such vehicle shall be guilty of Negligent Homicide."

It continued by explaining the meaning of the phrase "willful or reckless disregard", by saying: "The test of recklessness embraces all of the attending circumstances in each particular case which proximately caused the death of any person." Finally, it included the challenged parts.

In determining the sufficiency of any part of this instruction, we must consider the instruction as a whole. In upholding the instructions when parts of an instruction were criticized, this court, in State v. Williams, syllabus ¶ 3, said:

"Instructions must be considered as a whole, and if when so considered, they correctly advise the jury as to the law, it is sufficient, although a portion thereof standing alone may be insufficient or erroneous." State v. Williams, 150 N.W. 2d 844, 845 (N.D.1967).

Considering the entire instruction on negligent homicide, we believe that the part complained of in Specification No. X was not error. The part complained of may have been more artfully drawn, but we do not believe that it misled the jury. Since any one of the four enumerated acts of misconduct could have been found by the jury to constitute driving a motor vehicle in reckless disregard of the safety of others, and as such driving is an essential element of the offense of negligent homicide, we find no merit in the defendant's contention that that part misled the jury.

Mr. Steele next argues that the court instructed the jury concerning matters not pertinent to the evidence presented.

The specifications of error and instructions complained of follow:

Specification of Error No. XII. "The court erred in instructing the jury concerning driving to the left of the center of the roadway in overtaking and passing another vehicle."

"You are instructed that the statutes of the State of North Dakota provide that no vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to the right-hand side of the roadway before coming within one hundred feet of any vehicle approaching from the opposite direction."

Specification of Error No. XIII. "The court erred in instructing the jury concerning the duty of drivers proceeding in opposite directions."

"You are instructed that the statutes of the State of North Dakota provide that drivers of vehicles proceeding in opposite directions shall pass each other to the right, and upon roadways having widths for not more than one line of traffic in each direction each driver shall give to the other at least one-half of the main-traveled portion of the roadway as nearly as possible."

Specification of Error No. XIV. "The court erred in instructing the jury concerning speed."

"You are instructed that under the laws of the State of North Dakota it is

unlawful for any person to drive a vehicle upon a highway at a speed that is unsafe or at a speed exceeding the speed limit prescribed by law or established pursuant to law. The speed limit where this accident took place was sixty-five miles per hour."

Specification of Error No. XI. "The court erred in instructing the jury concerning operating a vehicle while under the influence of intoxicating liquor."

"You are instructed that under the law of the State of North Dakota that no person shall drive or be in actual physical control of any vehicle upon a highway in this state if he is under the influence of intoxicating liquor.

"A person 'drives' a vehicle within the meaning of these instructions when, by operating one or more of the controls of the vehicle, he causes the same to move or affects its movement in some manner or direction.

"A person is in 'actual physical control' of a vehicle within the meaning of these instructions when the vehicle is operable and he is in position to manipulate one or more of the controls of the vehicle that cause it to move or affects its movement in some manner or direction.

"A 'highway' as used in these instructions means the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel.

"The phrase 'under the influence of intoxicating liquor' is a flexible term. The mere fact that the driver of a motor vehicle may have consumed intoxicating liquor does not necessarily render him 'under the influence of intoxicating liquor.' The circumstances and effect must be considered. On the other hand, the driver of a motor vehicle need not be intoxicated or in a state of drunkenness, to be 'under the influence of intoxicating liquor.' This expression covers not only all the well-known and easily recognized conditions and degrees of intoxication, but also any abnormal mental or physical condition which is the result of indulging to any degree in intoxicating liquors, and which tends to deprive a driver of that clearness of intellect or control of himself which he would otherwise possess. Accordingly, if intoxicating liquor has affected the nervous system, brain, or muscles of a driver of a motor vehicle so as to impair, to an appreciable degree, his normal ability to operate a motor vehicle, he is 'under the influence of intoxicating liquor.' Whether the defendant was 'under the influence of intoxicating liquor' is a question of fact for you to determine."

Mr. Steele argues that there was no evidence presented to show that he ever attempted to pass anyone. The State responds that the instruction attacked as error by Specification No. XII is supported by the fact that the tire tracks of Mr. Steele's car originated on the left side of the road where the accident occurred and ended where his vehicle came to rest.

The theory of the State's case was that Mr. Steele, in attempting to pass the Facey vehicle, met and collided with the Susag vehicle, forcing it into the Facey vehicle's lane of traffic, causing a collision between the Susag and Facey vehicles.

Whether the events occurred as alleged was a question of fact for the jury to determine.

After reviewing the evidence, we conclude that the jury could have reasonably inferred from the position of the vehicles after coming to rest, the marks on the highway leading to the Steele vehicle, the damage to the right front corners of the Steele and Susag vehicles, and the paint analysis presented by the F.B.I. expert, that Mr. Steele was attempting to pass the Facey vehicle to the left at a time when the left lane was not clearly visible and free of oncoming traffic and that in so doing his vehicle collided with the Susag

vehicle, throwing it into the Facey vehicle's lane of traffic. We accordingly find no error in the instruction complained of in Specification No. XII.

Next Mr. Steele argues that there was no evidence to indicate that he ever attempted to meet any vehicle in an improper fashion. This relates to both Specifications of Error No. XII and XIII. The State responds that the evidence which shows that both the Susag and Steele vehicles sustained damage to their right front corners, along with the marks on the highway, justifies a conclusion that Mr. Steele was attempting to meet a vehicle in an improper fashion. What we have said relating to Specification No. XII also applies to this contention. Accordingly, we find no merit in it.

In Specification No. XIV Mr. Steele asserts that the instruction concerning driving at an unsafe speed was in error because the uncontradicted evidence shows that there was no issue of speed in the case, i. e., that he was traveling within the posted speed limit. The State responds that the jury could have found that Mr. Steele passed Mr. Facey when Mr. Facey was driving between 60 and 65 miles per hour, that Steele's car traveled 537 feet after the collision with the Susag vehicle, that Steele was under the influence of intoxicating liquor, and from these facts the jury could have concluded that Mr. Steele was driving at an unsafe speed.

The instruction given by the district court applied not only to speeds in excess of the statutory limits but also to speeds that were "unsafe". When the person in actual physical control of a motor vehicle is under the influence of intoxicating liquor the speed at which he drives may be "unsafe" even though below the limit prescribed by law.

We agree with the State and accordingly conclude that Specification of Error No. XIV is without merit.

Mr. Steele argues, in Specification No. XI, that the instruction on driving while under the influence was in error because the court told the jury that it should determine whether Mr. Steele was under the influence and did not instruct it that it was a question of fact to be determined by the jury whether Mr. Steele was driving while under the influence of intoxicating liquor. In addition, Mr. Steele believes that there was no evidence to show that he was driving or was in control of the vehicle at the time of the accident and no admissible evidence to show that he was under the influence.

In response, the State contends that Mr. Steele himself admitted to Officer Marchus that he was driving and that, although the court did not at this point instruct the jury that the fact of Mr. Steele's driving while under the influence was a question of fact to be determined by it, the court did earlier instruct the jury that one of the essential elements of negligent homicide was that Mr. Steele "drove a motor vehicle".

As we have previously said herein, instructions must be considered as a whole. State v. Williams, *supra*, 150 N.W.2d 844, 847. Considering the instant instruction, along with that which instructs the jury that the State must prove beyond a reasonable doubt that Mr. Steele "drove a motor vehicle", it is our opinion that the court did not err when it stated, "Whether the defendant was 'under the influence of intoxicating liquor' is a question of fact for you to determine".

Officer Marchus testified that, on September 6, when he interviewed Mr. Steele at his home, Mr. Steele, in response to a question about whether his car collided with another car, stated that he had hit his brakes and gone into the ditch. He also told Officer Marchus that he had been going 65 miles per hour. When Mr. Erickson found Mr. Steele he was lying alongside his car with the driver's door

open and no one else in view. The jury could reasonably infer from this evidence that Mr. Steele was driving his vehicle at the time of the accident.

In response to Mr. Steele's contention that there was no admissible evidence that he was under the influence, the State refers us to the testimony of Officer Marchus, Neal Skovholt, Harlan Muehler, Roger Erickson, and Officer Arenstein.

Each of these witnesses testified as to some aspect of Mr. Steele's appearance and expressed the opinion that he was under the influence of intoxicating liquor. Some had seen Mr. Steele prior to the accident and some after. For reasons stated hereinafter in our discussion of Specifications of Error Nos. I, II, III, and IV, these opinions were properly admitted into evidence. From this testimony we believe that the jury could have reasonably inferred that Mr. Steele was under the influence of intoxicating liquor at the time of the accident.

For the reasons stated, we believe that the jury could have reasonably inferred from all the evidence that Mr. Steele was driving his vehicle at an unsafe speed while under the influence of intoxicating liquor, while attempting to pass the Facey vehicle, and that in so doing he violated the rules of the road embodied in the instructions criticized herein, thereby causing the fatal accident. Accordingly, we find no prejudicial error in this instruction.

Mr. Steele, in Specification No. XV, contends that the instruction relating to the contributory negligence of Mark Alan Susag was in error because it, in effect, told the jury that regardless of the negligence of anyone else, Mr. Steele would still be guilty of negligent homicide if he were guilty of any negligence whatever that constituted a breach of law. He further argues that, under the instruction, if he were found to have gone to the left side of the road to avoid the accident and there collided with one of the vehicles, he would be guilty of negligent homicide.

The State responds that, instead, the instruction merely stated that just because Mark Alan Susag may have been negligent, this would not exonerate or excuse Mr. Steele nor make his conduct any less criminal.

The instruction reads:

"Evidence of the negligence, if any, of the decedent Mark Alan Susag was received and may be considered by you only for the purpose of shedding light upon the cause of the mishap out of which the prosecution arose. The fact that the decedent was guilty of negligence which contributed as a proximate cause of his injuries and death, if you so find, does not exonerate or excuse the defendant, unless the negligence of the decedent was the sole cause of his death. If you find that the conduct of the defendant in this case is otherwise criminal, it is no less criminal by reason of the fact that the conduct of others may have contributed in forging the chain of causation that produced the accident."

■ We think the instruction states the proper rule. The authors of Corpus Juris Secundum have this to say:

"If a negligent or culpable act of accused was a cause of death, it is not a defense to a prosecution for homicide that the negligence of deceased contributed thereto, * * *" 40 C.J.S. Homicide § 11, p. 853.

The supreme court of South Dakota discussed the law of contributory negligence in homicide actions in State v. Nuzum in 1931. The defendant was appealing a conviction for manslaughter in the first degree which arose as the result of an automobile accident.

The trial court instructed the jury as follows:

" 'Some evidence has been introduced tending to show that the deceased was negligent in the operation of his own automobile. I charge you as a matter of

law that if you are satisfied beyond a reasonable doubt that the defendant Thomas Nuzum caused the death of Garfield Simons, Jr., by driving the Nuzum automobile against the car of the deceased in a reckless and negligent manner, and if you further find that such conduct on the part of the defendant was the proximate cause of the death of Garfield Simons, Jr., then the fact, if it should be a fact, that the deceased may have been negligent in the operation of his own automobile would constitute no defense.'" State v. Nuzum, 58 S.D. 6, 234 N.W. 665, 668 (1931).

Upholding the conviction, the South Dakota supreme court had this to say about the instruction:

"This instruction was a correct statement of the law. Contributory negligence of the person killed is no defense to a prosecution for homicide. [Citations omitted.]" State v. Nuzum, *supra*, 234 N.W. 665, 668.

Mr. Steele next contends that the court erred in giving its instruction defining circumstantial evidence (Specification No. VIII). The instruction reads:

"A fact in dispute may be proven by either direct evidence or circumstantial evidence or by both.

"Direct evidence, such as the credible testimony of an eye witness, is the sort which directly proves a fact in dispute without the aid of an inference and which in itself, if true, establishes the fact.

"Circumstantial evidence consists of facts and circumstances in the case from which the jury may reasonably infer, from the common experience of mankind, the existence of a fact in dispute.

"The Defendant may be found guilty even though no one saw him commit the act, if the circumstantial evidence is such as to satisfy you of his guilt beyond a reasonable doubt. *While a criminal offense may be proved by circumstantial evidence, the facts and circumstances in evidence should be consistent with each other and with the guilt of the Defendant, and inconsistent with any reasonable theory of the Defendant's innocence. If the circumstantial evidence refutes every reasonable hypothesis of the Defendant's innocence it is entitled to as much weight as direct evidence."* [Emphasis added.]

Mr. Steele argues that the instruction could have misled the jury into believing that it was at liberty to speculate as to the events that happened and led to the fatal accident and that the instruction fails to advise the jury that in order to convict on circumstantial evidence the inference drawn from that evidence must exclude every other hypothesis except the single one of Mr. Steele's guilt.

North Dakota Jury Instruction No. 1009, which is identical to the instruction given in this case, lists as authority State v. Tucker. *Tucker* involved an appeal from the judgment of conviction of the crime of murder and from an order denying a motion for new trial. In that case this court approved the following circumstantial evidence instruction:

"And if each such circumstance is proved to your satisfaction beyond a reasonable doubt and all such circumstances, when taken together, convince your minds beyond a reasonable doubt of the guilt of the defendant, then a verdict of guilty is warranted even though the evidence tending to connect the defendant with the commission of the crime be entirely circumstantial. The circumstances proved by the State tending to connect the defendant with the commission of the crime must be consistent with each other. *That means that any circumstance which is contradictory of any other circumstance or which does not fit in to the whole array of circumstances cannot be considered by the jury.* And all of the circumstances taken together, with

all reasonable, legitimate inferences to be drawn therefrom, must not only be consistent with the guilt of the defendant but must exclude every other reasonable theory arising from the evidence in this case, upon which theory the defendant may be innocent." State v. Tucker, 58 N.D. 82, 224 N.W. 878 at 883 (1929). [Emphasis added.]

■ It is our belief that the italicized words in the instruction in essence say that the inferences from the evidence must exclude every reasonable hypothesis of innocence or the jury must find the defendant innocent. Accordingly, this instruction did not constitute prejudicial error.

In a recent murder case wherein the conviction was based upon circumstantial evidence, we said:

"Without adopting the inference-upon-inference rule, it is our view that the defendant's rights were protected against the evil intended to be avoided by the rule, by the court's instructions that the jury must find the defendant guilty beyond all reasonable doubt and that when the circumstances are consistent with the hypothesis of the accused's innocence as well as with that of his guilt, the jury must find him innocent. * * *" State v. Champagne, 198 N. W.2d 218 at 229 (N.D.1972).

Although the instructions in *Tucker* and in *Champagne* vary somewhat from the instructions in the instant case, we believe that they are in essence similar.

It is our view that the instruction on circumstantial evidence correctly stated the law and that it did not mislead the jury into believing that it was free to speculate as to the cause of the fatal accident.

In Specification No. IX Mr. Steele claims that the district court was in error in instructing the jury concerning the opinion of expert witnesses because "nowhere in the evidence was there any opinion of an expert witness based upon an assumed state of facts."

The complained-of instruction reads:

"The opinions of an expert witness are based upon an assumed state of facts. While you need not accept such opinions, you should consider them and give them such weight as is reasonable in the light of all the circumstances. If the assumed facts have been proven beyond a reasonable doubt, you should give such opinions the weight you think they deserve. If the assumed facts have not been so proven, you must give such opinions no weight."

The record shows that Dr. C. W. Jacobson, a physician licensed to practice medicine in Minnesota and North Dakota, testified as follows relative to the death of Mrs. Facey:

"Q. Were you able to obtain a history of the patient at this time?

"A. Yes.

"Q. Will you please state what that history was.

"A. She stated she had been in an auto accident.

"Q. Did you examine Mrs. Facey?

"A. Yes.

"Q. Will you please state to the jury what your findings were relative to the examination."

Dr. Jacobson then testified that Mrs. Facey had multiple injuries, including bruises on her face, severe fractures of both legs, fractures of both wrists, fractured ribs, and fractures of the facial bones. She had low blood pressure and was in mild shock.

"Q. Do you have an opinion, based on reasonable medical certainty, as to whether these injuries resulted in the death of Mrs. Facey?

"A. Yes.

"Q. What is your opinion?

"A. She died from the injuries.

"Q. Do you have an opinion based upon reasonable medical certainty as to what was the proximate cause of the injuries that resulted in the death of Florence Facey?

"A. Yes.

"Q. What is that opinion?

"A. I believe she died as a result of the auto accident, from the history I obtained as well as from the patient."

■ On the basis of this testimony it is obvious that there was at least one opinion of an expert witness based upon an assumed state of facts in the record. Accordingly, the instruction was proper.

Mr. Steele also argues the following:

Specification of Error No. XIX. "The court erred in fraternizing with the jury during the trial and the court erred in making remarks to defense counsel in the presence of jury members."

The matter about which Mr. Steele complains does not appear in the transcript of the record but appears only in an affidavit of one of the jurors.

In this affidavit, Maxine King stated that while she was in the courtroom prior to the start of the trial session scheduled for 1:15 p. m. on November 28, 1972:

" * * * the Honorable Wallace E. Warner, presiding Judge, entered the courtroom in his shirtsleeves; that he came over and sat in the spectator seats with the jury members and engaged them in conversation. At that time Bayard Lewis, one of the defense counsel, was sitting at the lawyer's table working with his files. That after the Honorable Wallace Warner had conversed with the jury members present for a short time, he raised his voice and said what is the going rate for jurors, now, Bayard. That after a short pause, Mr. Lewis answered, you will have to ask the jury members."

In another affidavit Ms. King stated that she was not sure what Judge Warner meant, but that what he said did not affect her judgment in reaching a verdict in the case.

Mr. Steele made no objection to the alleged prejudicial remarks, either at the time they were uttered or thereafter during the trial.

■ This appeal is from the judgment and sentence of the trial court. We have held that in such cases we may review only those errors of law committed by the trial court and appearing in the record of the action which have been preserved and presented in the manner prescribed by statute. State v. Haider, 150 N.W.2d 71, 73 (N.D.1967); State v. Timm, 146 N.W.2d 552, 554 (N.D.1966); State v. Dietz, 115 N.W.2d 1, 7 (N.D.1962); State v. McClelland, 72 N.D. 665, 10 N.W.2d 798, 801 (1943). Since no objection was made at the time of the alleged misconduct and no record was made thereof, it is deemed waived. In so holding, we do not condone the remarks, if in fact they were made.

"a. A judge should conduct a dignified and orderly trial designed to expedite the business at hand." West: State Trial Judge's Book 2d Ed., page 355 (1969).

Canon 3A.(3) of the Code of Judicial Conduct proposed by the American Bar Association Special Committee on Standards of Judicial Conduct, reads in part:

" A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, * * *"

In Specifications of Errors of Law No. V and No. VI, Mr. Steele contends that

the court erred in denying his motions for instructions of the court advising the jury to acquit at the close of the State's case and again at the close of all the evidence.

■ In light of our numerous decisions holding that error cannot be predicated on the denial of such a motion, it is clear that there was no error in the district court's rulings. See State v. Loyland, *infra*, at 626, and cases cited therein.

"Error cannot be predicated on the denial of a motion for an advised verdict for acquittal." State v. Loyland, 149 N. W.2d 713, Syllabus ¶ 7 (N.D.1967).

Specifications numbered I, II, III, and IV are based on the district court's overruling of Mr. Steele's objections to testimony by Lyle Marchus, Harlan Muehler, Neal Skovholt, and Richard Arenstein, which resulted in their expression of opinions as to whether Mr. Steele was under the influence of alcoholic beverages.

■ The subject of nonexpert testimony regarding intoxication was discussed by the supreme court of Wisconsin in City of Milwaukee v. Johnston. Upholding the appellant's conviction for driving while under the influence of an intoxicant, the court said:

"'(A) lay witness, who has the opportunity to observe the facts upon which he bases his opinion, may give his opinion whether a person at a particular time was or was not intoxicated.' [Citations omitted.]" City of Milwaukee v. Johnston, 21 Wis.2d 411, 124 N.W.2d 690, 693 (1963).

■ The opinions offered with respect to the intoxication of Mr. Steele were all prefaced by a description to some extent of his appearance, manner of walking, manner of speech, or breath. It is our conclusion from the record that the witnesses had suitable opportunity for observation and that, therefore, sufficient foundation was laid for receipt of their opinions.

■ Assignments of error not argued in the brief are deemed abandoned. See Gleson v. Thompson, 154 N.W.2d 780, 791 (N.D.1967); State v. Loyland, 149 N. W.2d 713, 716 (N.D.1967); State v. Hanson, 73 N.W.2d 135 (N.D.1955); State v. Tjaden, 69 N.W.2d 272 (N.D.1955). Because Mr. Steele has chosen not to present arguments in his brief or in oral argument before this court with respect to specifications of errors of law numbered VII, XVI, XVII, and XVIII, we have not considered them in this opinion.

Finally, Mr. Steele presents six specifications of the insufficiency of the evidence. These six specifications, taken together, set forth his view that the evidence presented clearly shows that he could not have been guilty of negligent homicide.

A large amount of the evidence in this case was circumstantial. In a 1963 case we were asked to determine whether the circumstantial evidence presented by the State was sufficient to sustain a conviction for arson. In that case we quoted with approval from C.J.S. as follows:

"'While a case based on circumstantial evidence should be scanned with caution, the fact that the evidence is circumstantial and conflicting does not alone empower the appellate court to weigh it or determine its sufficiency, if it reasonably tends to prove the guilt of accused and fairly warrants a conviction. The question is whether there is evidence to support the verdict; and a verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed unless wholly unwarranted, even though the evidence is weak and unsatisfactory to the appellate court. The reviewing court is not required to explain the process by which the jury arrived at their determination.

"'Where the circumstances are consistent with the hypothesis of accused's innocence as well as with that of his

guilt, the jury, or the trial court trying the case without a jury, must draw the inference, and an appellate court will not substitute its judgment for that of the jury or of the trial court. This rule should not be confused with the rule laid down for the guidance of the trial court * * * that the evidence must be of a conclusive character and must exclude every reasonable hypothesis of innocence. * * *' 24A C.J.S. Criminal Law § 1882 (1962)." State v. Carroll, 123 N.W.2d 659 at 669 (N.D. 1963).

It is not our function to substitute our judgment for that of the jury but instead only to examine the evidence presented in order to determine whether it supports the verdict and whether the defendant received a fair trial. State v. Carroll, *supra*, 123 N.W.2d 659 at 669.

The basic facts upon which the jury decided this case have been previously set forth herein. It is our conclusion, without restating or summarizing them further, that the evidence presented supports the verdict. We believe that Mr. Steele received a fair trial.

Accordingly, the judgment and sentence are affirmed.

VOGEL, TEIGEN, PAULSON and KNUDSON, JJ., concur.